**Phillip Allen FULTZ, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. C14–88–342–CR.**

Court of Appeals of Texas,
Houston (14th Dist.).

April 13, 1989.

Jerry Hanson, Michael A. Lamson, Houston, for appellant.

Linda A. West, Houston, for appellee.

Before PAUL PRESSLER, ROBERTSON and ELLIS, JJ.

OPINION

PAUL PRESSLER, Justice.

Appellant was convicted, by a jury, of driving while intoxicated. The court assessed punishment at one year confinement in the Harris County Jail probated for two

years and a fine of $450.00. We reverse and remand for proceedings consistent with this opinion.

On August 6, 1987, Officer D.A. Jones, a Houston Police Officer stopped appellant for suspicion of driving while intoxicated. The officer administered several field sobriety tests. Having unsatisfactorily performed these tests, appellant was placed under arrest. Once at the police station, appellant was given the sobriety tests under video observation. The video is not a part of the record. He was also tested by the intoxilizer which registered his alcohol level at .10. This is the minimum level for legal intoxication.

At trial, appellant called Mr. Robert Bauer as an expert witness on the intoxilizer instrument. On voir dire, Mr. Bauer testified that he had a bachelor of science degree in Biology from Southwest Texas State University with a dual minor in Chemistry and Mathematics. Upon graduation he received medical training by working as a medical technician at M.D. Anderson Hospital and Camp Gary Job Corp. Medical Hospital. As a medical technician, he conducted various lab tests and analysis which involved blood. From 1970 to 1980, Mr. Bauer served as a technical supervisor for the Texas Department of Public Safety. He was certified on the instruments the Department of Public Safety had at the time he was employed there. Before he left, the D.P.S. obtained an intoxilizer 4011 AS–A machine. This was the type used with the appellant. However, it was not certified until after Mr. Bauer left the D.P.S. He was certified on the breathalyzer which was being used at that time. Upon leaving the D.P.S. all certifications which Mr. Bauer had were cancelled.

After leaving the D.P.S., Mr. Bauer started his own company, Scientific Safety Technology. This company tests samples, performs consultation and analyzes various scientific equipment for different forensic organizations and other corporations outside the criminal legal field. Mr. Bauer testified that two to three months earlier he had acquired an intoxilizer 4011 AS–A machine. During that time he conducted numerous tests to determine whether its results were accurate and whether other factors such as frequency interference and residual alcohol could affect its results. He stated that he had conducted "probably some one thousand" tests on the machine and that they were conducted with the same controls as those administered by the D.P.S.. Part of these tests involved comparing the breath samples to blood samples of people who had ingested alcoholic beverages.

On direct examination Mr. Bauer stated that he had obtained an electronic schematic of the intoxilizer and understood how the machine operated. He testified that he had conducted several seminars through out the State and had attended criminal defense lawyer seminars where the issue was DWI. Mr. Bauer explained the scientific principals upon which the intoxilizer is based. Lastly, Mr. Bauer testified that the breath to alcohol ratio, or the gas partition ratio, at which the intoxilizer is set is 2100 to 1. He concluded that this ratio varies significantly. Mr. Bauer testified that the medical profession has concluded that the average ratio is above 2100 to 1 and is closer to 2300 to 1. In addition, the ratio varies from 900 to 1 to a high of 3400 to 1. Mr. Bauer's conclusions as to the reliability of the intoxilizer were as follows:

Q. (By Mr. Hanson) Based upon the test that you conducted on the model 4011 AS–A, is it your opinion that it is a machine which is reliable beyond a reasonable doubt with respect to proving whether or not one did have at the time of a certain test a certain percentage of alcohol concentration in his breath?

A. No, Sir.

Q. What did you observe to lead you to that conclusion?

A. The biggest inherent problem with the machine was that it—can malfunction in one instance and without any repairs can function properly in the next instance. As far as specific tests were concerned, the slow detection with regard to residual alcohol does

not always function within the ramifications which the State of Texas or intoxilizer CMI[1] purports that it should. There, again, we have not tampered with this machine. It's just as it had come from the manufacturer. That is the reason we haven't taken it apart to try to see how it works.

With regards to radio frequency interference, we have detected interference with this particular machine who has the very latest modification to prevent radio frequency interference from interfering with it. There, again, the purpose of that was because it was reported that radio frequency did not interfere with the intoxilizer. This one has a lot of built in things so we tested it for that. And we did find frequency interferences with as small as a four-Watt radio hand-held transmitter.

Q. Would that be the type that the police have in their pocket while they are around the breath test machine?

A. Pretty close to it. Theirs are probably a little stronger than the four-Watt that I used. I don't have the model of it. Their battery packs that the police use are a little larger than the battery packs I had in my particular time that I used to check that type of radio frequency.

Mr. Bauer further testified regarding problems with the acetone detector and the residual alcohol slope detector which is utilized to determine the difference between alcohol in the breath and the alcohol which is retained in the mouth upon consumption. This testimony continued as follows:

Q. Did you perform any tests on it for acetone or determine whether or not the acetone detector was working properly?

A. Yes, sir.

Q. And what were your findings?

A. Sometimes it would work and sometimes it would not work. Sometimes it would work when acetone—it would interface into print mode system when acetone was not even interjected into the sample chamber.

Q. It would show acetone?

A. It would show an interference and there wouldn't even by any acetone in it or near it, so maybe it was interfering with some other compound contained on the human breath. I don't know. So it would act sometimes when acetone wasn't even present.

Q. Did it ever fail to show acetone when you, in fact, injected an acetone solution in it?

A. I have never injected acetone solution into this particular machine.

Q. Now, what other problems, if any, did you find with the 4011 AS-A?

A. The residual alcohol slope detector.

Q. Would you explain that to the Court?

A. Yes, sir. Of course, the slope detector is supposed to tell the difference in alveolar breath and alcohol contained in the alveolar breath and alcohol contained in the mouth cavity which would be present from either regurgitating, burping or belching from the stomach or from using mouth wash and just consuming an alcoholic beverage. At times, the slope detector could not detect the difference in alveolar breath and the alcohol that was contained in the mouth from either a belch, burp or regurgitation or mouth wash or just washing the mouth out with an alcoholic beverage and it would go ahead and print the results of the test anyway.

Q. Although it's supposed to shut down at that time?

A. That's right; it's supposed to be able to detect the difference in the alveolar breath and residual alcohol and then lock out the print mode for a test result. And on numerous occasions it was overwritten and it did print the results which were strictly based upon alcohol contained in the mouth and not alcohol contained in the breath.

Mr. Bauer then testified based upon his experience as a medical technician and through his work for the D.P.S. This testi-

---

1. The manufacturer of the intoxilizer.

mony, regarding blood alcohol levels, was as follows:

Q. Assuming that a 350 pound man over a period of about 30 minutes drank 24 ounces of beer and then about 15 minutes later he was stopped and arrested for driving while intoxicated, do you have an opinion based upon your experience and training as to what his correct breath alcohol concentration would have been at that time on an intoxilizer test?

A. At the time he was stopped?

Q. Yes.

A. I would have to do some figuring.

Q. Could you calculate that for us?

A. Yes sir. Approximately .02 percent.

The trial court then allowed Mr. Bauer to testify regarding blood alcohol levels. However, Mr. Bauer was not allowed to testify regarding the intoxilizer.

The determination of whether an expert witness possesses the required qualifications rests largely within the discretion of the trial court. The decision to admit or exclude proposed testimony will not be disturbed absent a clear abuse of discretion. *Steve v. State*, 614 S.W.2d 137 (Tex.Crim. App.1981); *Powers v. State*, 757 S.W.2d 88 (Tex.App.—Houston [14th Dist.] 1988, no pet.). Texas Rule of Criminal Evidence § 702 provides as follows:

If scientific, technical, or other specialized knowledge will assist the trier of fact to determine the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

There are three basic requirements a witness must meet to qualify as an expert. These requirements are as follows:

1. The witness must have knowledge of a scientific, technical, or other specialized area recognized as having support in the community.[2] This knowledge may come from a variety of sources including technical work, specialized education, or practical experience. Therefore, a witness does not have to have a professional credentials or license to qualify as an expert.[3]

2. The testimony must aid the jury in understanding a material issue.[4]

3. The opinion must be on information the jury does not possess or understand absent such testimony.[5]

Mr. Bauer's experience with the D.P.S., his training as a medical technologist and with the D.P.S. regarding blood and blood alcohol content and his experience from conducting experiments on exactly the same equipment used in this case gives Mr. Bauer both technical and specialized knowledge. Whenever the results of the intoxilizer tests are admitted into evidence, the reliability of the equipment and its results are brought into question. This is especially true when the result of the defendant's test is the minimum required for legal intoxication. Mr. Bauer's knowledge regarding the intoxilizer certainly exceeded that of the jury. Mr. Bauer met all three requirements and, therefore, was qualified to testify as to the reliability of the intoxilizer.

The State claims that Mr. Bauer was not qualified because he failed to present any documentation regarding the experiments that he had conducted. This documentation would not make him any more or less qualified. It would merely support his conclusions and go to the weight of his testimony rather than to its admissibility. The testimony should have been admitted.

The judgment is reversed and remanded for proceedings consistent with this opinion.

---

2. *Holloway v. State,* 613 S.W.2d 497 (Tex.Crim. App.1981); citing R. Ray, Law of Evidence, 2 Texas Practice sec. 1400 (3rd Ed.1980).

3. *Holloway,* supra.

4. Rule 702 Tex.R.Crim.Evid.

5. *Holloway,* supra; *Powers,* supra.